Boeing, J.,
dissenting:
The record shows that the contracts in quadruplicate were sent from Washington on the 13th of November, 1859, for the purpose of their execution by the petitioners, (p. 12 ;) that they arrived out there December 12, (p. 2?,) -and were executed and despatched to Washington the 11th of January, 1860, and that they did not arrive in Washington until after the notices for new proposals had been issued, which was on the 10th of February, 1860.
The record states that there was delay, from the hostilities of the *553 Indians on the plains, in tlie transit of the mail to and from New Mexico, but this had nothing to do with the delay of a month, after the contracts bad arrived in New Mexico, in their execution, which required nothing but the signature of the petitioners, and I think the evidence adduced by the petitioners charges this delay upon them.
Major Donaldson, after testifying that the contracts arrived in New Mexico December 12, was asked when they were “ executed and forwarded” to Washington, and in answer ho says : “ They were executed and forwarded by me about the 11th of January, 1860 and he exhibits the letter which accompanied them, which is dated 11th of January, 1860. And in another exhibit, which is his report to General Jesup, he says : “ The cause of the delay in transmitting you the contracts was owing to the detention on the plains in consequence of the hostilities of the Indians, and the delay of the contractors in executing and returning me the contract.” (p. 15.)
On this evidence, I think the petitioners cannot be held innocent of the delay that occurred in the return of the contracts to Washington, and it was that delay which caused the notices for new proposals. General Jesup, in his report to the Secretary of War submitting the returned contracts, on February 25, says : “ The contracts not having boon received from New Mexico at the time they were expected, it became necessary to take measures to secure the transportation of the supplies for the troops in New Mexico, and an advertisement was inserted in the newspapers inviting proposals for transportation on the routes embraced by these contracts.”
This is the testimony of General Jesup as to the circumstances which induced the notices for new proposals, and it is his opinion upon the necessity for these at the time, and both are of great weight from his official position and experience, and the matter was one submitted to the discretion of the department.
I think the evidence in the case confirms the testimony and the opinion of General Jesup. The transportation of supplies for the troops in New Mexico was an imperative necessity to be secured beyond mischance, and it was to be done by advertising for proposals. To secure the advantages of advertising, time was required for the circulation of the advertisements ; and after that, for the preparations for service by the party contracted with.
The notices for proposals on which the contracts of the petitioners were made, issued June 27, 1859, for proposals until October 1,1S59, for service to begin January 1, J 860 ; so that from the beginning of the advertisements to the beginning of the service was six months. *554 This shows the time used by the department when it could take the time it wished for its purposes.
But for the new proposals this time was not to he had ; and for these the notices issued February 10, 1860, for proposals until the 11th of April, for service on the 1st of May, so that the whole time from the beginning of the advertisements to the beginning of the service was only three months instead of six ; and the record shows that the service actually begun the 2d of May, 1860, (p. 158.)
I think that this evidence shows that on the 10th of February, 1860, it had become, as General Jesup states, “ necessary for the government to take measures to secure the transportation of the supplies for the troops and, therefore, that the government were then authorized to issue notices for new proposals ; and I think this is conclusive of the case, for if the government were free to invite new contracts, they were free to make them. And as the necessity for notices for new proposals was created by the fault of'the petitioners, I think they have no claim, and that the defendants are entitled to judgment for the reasons stated.
It is objected on the part of the United States that the contract was never accepted by them, and, like an undelivered deed, is without any binding-effect. And I think that this objection is sustained by the evidence.
The contract required that the schedule or tabular statements annexed to it should be signed by the petitioners; this they omitted to do, and returned the contract incomplete in that particular; and the Secretary expressly objected this in refusing the contract.
Then the evidence shows that the contracts in quadruplicate were sent to New Mexico to be executed by the petitioners there. This transmission of them by the United States was not, on their part, a legal delivery of the contract binding them therefrom, because it was done “ diverso intuitu and its purpose, the complete execution of the contract by the petitioners, according to the forms of law, and its own specific requirement, was a condition precedent to its obligation on the United States ; and until the performance of the condition the contracts remained a mere escrow of no binding effect whatever, and were so when they were rejected.
And the defect alleged, that the petitioner did not sign the schedules, has nothing to do with the formal execution of the papers; that was ■complete by signing and sealing the contract, for the law required no more; but that the schedules should be signed was the requirement of •the contract itself and one of its provisions ; as such, it was a part of the contract, and a part of the law which the parties had made for *555 themselves, as much as any other provision of the contract, and a court of law can no more disregard that provision than they can any other ; and in a court of law a party cannot maintain an action for the nonperformance of a contract which shows upon its face his own non-complianee with a provision which was a condition precedent to its performance; and equity will not interfere to restore to a party a right of action at law which he has forfeited by his own carelessness.
Hughes, J,
delivered a separate opinion:
The material facts in this case are as follows ■: Proposals for the transportation of army supplies were invited by the War Deparmeut of the United States by public advertisements dated June 27, 1859. The petitioners were the successful bidders for the transportation of all supplies during the years 1860 and 1861 over the routes designated in two several specifications in the printed proposals, viz., No. 2, from Forts Leavenworth and Pile}’, in the Territory of Kansas, and fr5m the town of Kansas, in the State of Missouri, to Fort Union, in New Mexico, or to any other depot designated in that Territory; and No. 3, from Fort Union, or such other depot as might he designated in the Territory of New Mexico, to the posts or depots in New Mexico, Forts Bliss and Fillmore excepted. ‘(Printed Record, pp. 7, 8.)
On the twelfth day of November, 1S59, written draughts of contracts and bonds for the due performance of the same were forwarded by mail from the office of the Quartermaster General to Major J. L. Donaldson, quartermaster at Santa Fé, New Mexico, to be executed by the contractors and their sureties in quadruplicate, and returned to the department, except one of each to be delivered to the contractors. They were all signed in Washington, on the part of the United States, by Major Sibley, before being sent out. (Record, pp. 9, 12.)
On the eleventh of January, 1866, Major Donaldson addressed a letter to the Quartermaster General, transmitting the contracts which were to be returned to Washington, “ duly executed,” as he believed. But it .afterwards transpired that, through advertence, the signatures of the contractors had not been subscribed to a schedule of prices annexed to the contract, and forming part of it. When this omission was discovered, one of their sureties, being a responsible person, made a written guarantee to the department that Moore & Boice would sign the schedule, said guarantee being dated “ Washington, February, 1860.” (Record, pp. 16, 18, 151.)
Before the receipt of the contracts at the War Department, viz., on *556 tlie 10th of February, 1860, a reletting of the contract was advertised, inviting bids for the same, at Fort Leavenworth, Kansas, on the 11th day of April, 1860. (Record, p. 18.)
On the 25th day of February, 1860, the contracts were referred to the Secretary of War by the Quartermaster General, with a recommendation that they be approved, with the understanding that the schedule of prices referred to should govern all payments. (Record, p. 149.) The Secretary of War declined to approve the contracts, or-to withdraw the advertisements for reletting, and indorsed his decision on the letter of the Quartermaster General transmitting the contracts, the date of his indorsement being February 28, 1860. (Record, p. 149.)
On the 8th day of March, 1860, Major J. L. Donaldson, assistant quartermaster, made a requisition in writing upon Moore & Boice, as contractors, for the transportation of 1,500 fanegas of corn from Fort Union to Fort Defiance, New Mexico.' (Record, p. 77.)
This corn the claimants transported, as directed, as far as Albuquerque, where it was stopped, by order of Major Donaldson,“in consequence of a change in the plan of some intended military operations. The claimants were paid for this service according to the rates specified in the schedule referred to in their contracts. (Record, pp. 154, 30, 37.) It seems that at the time this service was required and rendered both Major Donaldson and Moore & Boice were ignorant of the fact that their contract had been set aside by the Secretary of War.
In pursuance of the advertisement, the contract was relet to Russell, Waddell & Majors, in April, 1860, and a written agreement perfected with them of that date, which was approved by the Secretary of War on the 25th day of April, 1860. Under this contract Russell, Waddell & Majors entered upon service. (Record, p. 121 et seq.)
The agreements, advertisements, bids, and other writings which have been referred to are all duly proved in evidence, and may be found at length in the printed Record.
The first question arising upon the foregoing facts is, whether Moore & Boice had a valid contract witli the United States at the time when the Secretary of War decided that the transportation of supplies over the routes awarded to them upon their bids, submitted in pursuance of the advertised proposals of the government, should be withheld from them, and that new proposals should be received for that service.
The laws of the United States required the Secretary of War to provide for this transportation by contract made upon published pro- *557 posáis and bids submitted in pursuance thereof. It could be done legally in no other way. (Statutes at Large, vol. 2, page 536, section 5.)'
Upon the acceptance of a bid, and the awarding of the transportation upon certain routes to the successful bidder, he acquired rights which could only be forfeited by some default on his part in the performance of the obligations resulting from the accepted bid and the proposals of the department under which it was submitted. Indeed, these constituted a contract. The proposals in this case, the bid of Moore & Boice, the guarantee for the due fulfilment of the contract by them, and notice of acceptance by the United States, are to be found in the printed Record, at pages 7, 8, and 9.
There is nothing in the proposals of the United States, or in the bid of the claimants, binding Moore & Boice to the execution of a further written agreement by the first day of January, I860, as seems to have been assumed by the Secretary of War. The proposals do stipulate that “ contractors must be in readiness for service by the first day of January, 1860,” and that is the only undertaking limited to that particular date. On the other hand, the bid of the plaintiffs, accepted under the proposals, stipulates for notice to them when their services should be required, the number of days being specified and graduated in the bid according to the number of pounds to be transported in each case.
There could be no default as to time on the part of the contractors, whereby they would forfeit their contract under this provision, without previous notice to them, and it does not appear in evidence that there was any such default, or indeed any failure whatever on the part of the contractors in readiness to comply with their agreement. On the contrary, it appears from the evidence that the first transportation required by the United States over the routes embraced in the contract of Moore & Boice, after they became contractors, was performed by them in a satisfactory manner, upon the requisition of Major Donaldson, the quartermaster in New Mexico, dated Santa Fe, March 8, 1860. (Record, page'77.) Major Donaldson was not then apprised of the action of the Secretary of War in setting aside the contract of Moore & Boice, which took place on the 28th of February, 1860. ( Record, page 149.) There was no further occasion for the transportation of supplies over the routes embraced in this contract until about the first of May, 1860, prior to which time the service had been awarded to Russell, Waddell & Majors, under their contract of April 11, I860.
(See General Johnston’s letter, Record, page 154, and Russell & Co.’s contract, Record, page 138.)
*558 The reasons of the Secretary of War for setting aside the contract of Moore & Boice are stated in his indorsement on the letter of the Quartermaster General transmitting the agreement sent out to New Mexico, and there signed, which indorsement is as follows :
“ Upon mature reflection, I think it best to receive such bids as may be offered under the advertisement now inviting them. It will throw open a wide door to competition, and is likely to result in a lower rate of transportation. As Moore & Boice have not complied with the terms of the original advertisement, which required the contracts and transportation to be ready by the 1st of January, and, moreover, as the contracts are not legally executed, but rest upon an ‘understanding’ that they are to be at some future day, I think it safest not to reverse the action already taken by the department.
“ J. B. FLOYD, Secretary of War.
“War Department, February 28, I860.”
The probability of a “lower rate of transportation,” which, had it even been verified, was no good ground for repudiating an existing contract, was never realized. Russell, Waddell & Majors, the old contractors, who had long had a monopoly of the transportation on these routes, walked in through the “ wide door to competition” opened by the action of the Secretary, and took the place of Moore & Boice under a contract providing for a higher rate of transportation than theirs.
The objection stated by the Secretary of War, that Moore & Boice were not ready with the contracts and transportation by the first of January, has been already in part discussed. In addition to what has been said in regard to the execution of written contraéis, after the accepted bid, by the first day of January, 1860, it may be observed that, even conceding the proposals and accepted bid constructively to provide for such contracts, the limitation of time for their execution seems to ine not to have been of such importance as to render its strict and literal observance essential to the preservation of the rights acquired by the claimants upon the acceptance of their bids by the department. Besides, it appears in evidence that whatever delay in the execution of the contracts and their transmission to Washington may have occurred, it was not caused by the default of Moore & Boice alone, but in part by casualties which they could neither have prevented nor foreseen, and in part by the non-action of those charged with the preparation of the papers in the department.
On the 4th of October, 1S59, the Quartermaster General reported to the Secretary of War the acceptance of the bids of Moore & Boice.
*559 On the 10th of October the acting Secretary, Mr. Drinkard, directed that contracts should be prepared. (Printed Record, p. 147.)
On the 12th of November, 1859, the contracts were forwarded from the office of the Quartermaster General in Washington to Major Donaldson, quartermaster in New Mexico, to he by him transmitted to Moore & Boice. ( Record, pp. 12, 153.) These papers reached the hands of Major Donaldson about the 12th day of December, 1859. (Record, p. 26.)
They were executed on the part of Moore & Boice before the 11th day of January, 1860, for on that day they were again in the hands of Major Donaldson, the agent of the government. (Record, p. 121.) On the 25th day of February, 1860, they were in the hands of the Quartermaster General. (Record, p. 149.) Major Donaldson says in a letter to the Quartermaster General, dated February 23, I860, that the delay in transmitting the contracts (to Washington) was “owing to their detention on the plains in consequence of the hostility of the Indians, and the delay of the contractors in executing and returning the contracts.” (Record, p. 15.)
It is by no means clear that the time intervening between the 11th of January and the 25th of February is to be charged as delay to the contractors. Major Donaldson was the agent of the United States.
A delivery of the contracts properly executed to him was perhaps sufficient, and there is no stipulation in the proposals and bids requiring the contracts to be filed by the contractors in Washington; especially is there none requiring them to be so filed by the first day of January, 1860. In this view of the case, the delay on the part of the contractors amounts only to eleven days after the first day of January, 1860.
The omission of the claimants to sign the schedule of prices is also assigned by the. Secretary of War as a reason for rejecting their contract altogether, and on that point the defence in this suit has been made for the most part to rest. This schedule of prices is nothing more than a statement in tabular form of the prices for transportation specified in the bid of Moore & Boice, to which they were already bound, and the objection made on account of their accidental omission to affix their signatures to it was one of form, not of substance.
It is untenable even as a matter of form. The schedule is referred to in the body of the contract signed by them, and the prices therein stated expressly agreed to. The signature to the contract was a sufficient “signing” of the schedule to make it binding, although it was not a subscribing of it. It was not important that the schedule should be subscribed by the parties, except as matter of description to make it *560 answer to the descriptivo reference in the main agreement. The omission of the signature of one of the contracting parties from the bottom of the schedule might have raised a technical question of variance in a suit at law, hut was not, in my opinion, a forfeiture of the whole contract of Moore & Boice, and of their rights under their accepted bid. In the partial performance of the contract which' took place before notice had reached New Mexico that it had been repudiated by the Secretary of War, no difficulty arose as to the prices stipulated, but compensation was paid by Major Donaldson, and cheerfully accepted, at the rate set down in the bid and schedule. I am of opinion, therefore, that Moore & Boice had a valid contract with the United States at the time when the Secretary.of War decided to withhold from them the transportation of army supplies over the routes .specified in their agreement. The repudiation of that contract by the Secretary of War, and his refusal to proceed with its fulfilment on the part of the United States, constituted, clearly, a breach which entitles Moore & Boice to recover damages. It remains, then, to consider the measure of damages and to ascertain the amount. The Supreme Court of the United States, in a decision well supported by other authorities, has held that the measure of damages in such a case is the clear profits the injured party would have realized from the performance of the contract. (Philadelphia v. Howard, 13th Howard, 307.) This is the rule to be applied to this case. It is proper here to notice one or two points made in the brief and argument of the counsel for the United States. It is insisted that the contract is so worded as not to hind the United States, absolutely, to deliver any portion of the supplies to be carried over the routes named in the contract to the plaintiffs. By the terms of the contract, it is said, the plaintiffs were merely to receive and transport “all such military supplies as may (might) be turned over to them for transportation.” It rested in the discretion of the officers of the army, argues the Solicitor, to give or withhold any part of the supplies to be forwarded. This argument is fallacious. An act of Congress made it the imperative duty of the Secretary of War to provide for the transportation of supplies by regular contracts made upon advertised proposals and bids. The very object of the law no doubt was to prevent quartermasters and other government agents from making special engagements or arrangements for the service. The contractor, under the law, had a monopoly of all transportation within the limits and terms of his contract required over the routes therein named. Therefore it was that Major Donaldson, as appears in evidence, after having, in a pressing emergency, made application to Connelly & Co. to transport *561 some corn for tbe army, recalled bis proposal, on tbe ground tbat Moore & Boice, being contractors, bad the exclusive right to render tbe service. (Printed Record, p. 77.)
It is further objected by tbe Solicitor tbat the evidence does not show a readiness to perform tbe contract, nor a tender to perform it on the part of tbe plaintiffs. Tbe evidence of tbe ability and readiness of tbe claiments to perform their contract, as well as of their high character as men of experience in tbe business in question, is full and satisfactory.
In addition to what has already been said on that subject, it is sufficient to refer to tbe evidence and note the fact that the securities given for the- performance of their contract were ample. (Printed Record, pp. 43, 51, 6í¡, 70, 16, 149.)
But when tbe Secretary of War, on tbe 25th of February, 1860, expressly repudiated tbe contract of Moore & Boice and rejected their services, after notice from their agent, Martin, of their readiness to perform, as proved in bis deposition, they were relieved from tbe obligation to continue thereafter in readiness, and from tbe duty of making a tender of performance, bad any such duty ever rested upon them.
Concurring, as I do, with tbe majority of tbe court in tbe opinion tbat tbe plaintiffs ought to recover, and in tbe rule by which their damages are to be measured, a difference of opinion in tbe application of tbe rule to tbe facts of this case has arisen, which has led me to dissent from the conclusion of tbe majority on tbe question of damages, and to state separately my conclusions, and the reaons on which they are founded.
Tbe written contracts in this case fix limits to tbe quantities of supplies to be transported in each year over the two routes respectively.
On route No. 2, viz., from Forts ¡Leavenworth and Riley, in tbe Territory of Kansas, and from tbe town of Kansas, in Missouri, to Fort Union, in New Mexico, tbe number of pounds which tbe contractor was bound to transport in each year, if called on, was from one hundred thousand pounds to two million five hundred thousand pounds.
The same limits were prescribed for tbe quantities to be transported in each year over route No. 3, viz., from Fort Union to tbe posts or depots in New Mexico, excepting Forts Bliss and Fillmore. (See printed Record, pp. 7, 114, 107, 108.)
With reference to tbe Territory of New Mexico, it will be observed tbat one of tbe routes, viz., No. 2, was external, and tbe other, No. 3, internal. By tbe terms of the contract the rates of compensation spe *562 cified in the bids of Moore & Boice, and in the schedule of prices, were different for the several months of the year.
If the number of pounds of supplies actually transported over each of these routes in the years 1860 and 1861, with the quantities carried in each month, can he ascertained from the evidence with reasonable certainty, then, at the contract prices, a correct estimate of the gross amount of money which Moore & Boice would have been entitled to receive can be made. This would furnish the proper basis for arriving at the' sum of their clear profits. On one point the evidence fails entirely to supply the requisite data for estimating damages in this way, viz., in fixing the quantities transported in each month. It is necessary, therefore, to resort to an average of the prices and net profits by the year. The proofs do not admit of any nearer approximation to the true amount. Proceeding in this way, we are able to arrive at the net profits for one of the routes with reasonable certainty; but as to the other, the evidence is altogether deficient in the proper elements of computation.
In making an estimate of profits by the year, I think the proper mode of arriving at the gross amount of compensation is to take the number of pounds transported during that year at the contract price, provided it does not exceed the superior limit mentioned in the contract. If it does exceed that limit, the excess should be deducted, as the plaintiffs cannot recover in an action upon their written contract for that. Where the proof is not satisfactory as to- the number of pounds transported during the year, I think the inferior limit mentioned in the contract is the proper basis of computation.
Proceeding to estimate the damages according to these principles, I find from the evidence that there was transported over route No. 2, in the year 1860,1,900,000 pounds. (Record, p. 154.) From this quantity is to be deducted fifteen hundred fanegas of corn, transported over that route in that year by Moore & Boice, for which they were paid at the contract prices. The fanega is a measure containing one hundred and forty pounds of corn; that is, estimating fifty-six pounds to the bushel, two and a half bushels.* Fifteen hundred fanegas of corn would be 210,000 pounds. Deducting this quantity from the 1,900,000 pounds, there remains 1,690,000 pounds transported over route No. 2 in the year 1860.
*563 Over the same route, in 1861, the supplies transported were as follows:
From Fort Leavenworth to Fort Union. 2,120, 398
From Fort Leavenworth to Fort Garland.:. 5,699
From Fort Leavenworth to Fort Wise. 1,151, 366
In all... 3,277,463
This was an excess of 777,463 pounds over the superior limit of the contract, which excess is to be deducted, leaving the number of pounds carried over this roirte
upon which to estimate profits for the year 1861. 2,500, 000
Add the number for 1860. 1,690,000
4,190, 000
It thus appears that the total number of pounds of supplies transported over route No. 2 during the period covered by the contract of Moore & Boice, and proper to be incluede in estimatinn their damages, was four million one hundred rnd ninety thousand.
In regard to the net profit per annum, under the contract, of trans portation on this route, being the one external to the Territory of New Mexico, I think the testimony is sufficient to establish clearly that it amounted, at the lowest estimate, to two cents per pound. (Record, pp. 41, 49, 52, 56, 57.) At that rate the claimants are entitled to recover, on this part of their claim, eighty-three thousand and eight hundred dollars.
The quantity of supplies transported over route No. 3, in 1860, was 1,267,000 pounds. (See letter of the Quartermaster General, printed Record, p. 154.)
It does not appear in evidence what quantities of supplies were carried over this route in 1861, but evidence is submitted to prove that the gross amount of money paid by the United States for transportation (under a different contract) was $8,582 64. ( See letter of Quartermaster General Meigs, additional Record, pp. 2, 3.
In this state of the evidence, it would be proper, as already indicated, to-take the inferior limit of the contract as the basis of computation, viz., one hundred thousand pounds, for the year 1861. Thus we would have for the total number of pounds to be estimated for, on route No. 3, during the two years, 1,367,000. But the evidence fails to establish either any rate per month or by the year, or sufficient facts from whifch *564 an estímate of net profits on that route can be formed. The testimony relied on by the counsel for the claimants, and used in his estimate, as to this route, is to the effect that the net profits would amount to one-half,the gross receipts of compensation. It must be apparent that the amount of the gross receipts would be affected by the rates of compensation stipulated for in the contract. The payments actually made, and given in evidence, were made under the contract with Russell, Waddell, & Majors, a contract at higher rates than those specified in the contract of Moore & Boice. In consequence of the failure of proof, therefore, upon which to assess the damages as to route No' 3, the claimants can recover nothing upon that branch of the case.
It is unnecessary for me to discuss the question as to how far the court is hound by the estimates of witnesses, as I have not followed them except where fully supported by the facts proven, and on which they were based, and have rejected both estimates and facts where the former were unsupported and the latter irrelevant,
I agree with the majority of the court that the claimants ought to recover. I dissent from the assessment of damages made by the majority of the court, and find the damages of the claimants at the sum of eighty-three thousand eight hundred dollars. For that sum it is my opinion that the plaintiffs ought to have judgment.

 The definition of “fanega,” given in Worcester’s dictionary, is “ameasure of grain equal to about one bushel.” This may be correct as to the Spanish measure, but the fanega of New Mexico is two and a half bushels.